# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| KENDRICK A. JOHNSON, | ) |
| Plaintiff, | ) ) ) |
| v. | ) 09 C 5189 |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) ) Judge Ronald A. Guzmán ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Kendrick A. Johnson has appealed the denial of his claim for Social Security disability benefits. Before the Court is plaintiff's motion for summary judgment. For the reasons provided in this Memorandum Opinion and Order, the Court grants in part and denies in part plaintiff's motion and remands the case to the Administrative Law Judge for further proceedings consistent with the rulings herein.

## Procedural History

On March 10, 2006, Kendrick Johnson filed a Title II application for disability insurance benefits ("DIB") and a Title XVI application for supplemental security income ("SSI"), alleging that his disability began on June 1, 2000. (R. 15.) His claims were denied initially and on reconsideration on December 28, 2006. (*Id.*) At his request, a hearing was held on September 22, 2008. (*Id.*) Johnson appeared and testified at the hearing. (*Id.*) In addition, Laura Rosch, D.O., an impartial medical expert, and Thomas A. Gusloff, an impartial vocational expert, testified. (*Id.*)

On October 10, 2008, the Administrative Law Judge John K. Kraybill ("ALJ") found that Johnson was not disabled under sections 216(i) and 223(d) of the Social Security Act through March 31, 2002, the date last insured. (R. 20.) Thus, he held that Johnson was not entitled to DIB. (*Id.*) However, the ALJ held that Johnson was disabled under section 1614(a)(3)(A) of the Social Security Act as of May 10, 2006, and thus he was entitled to SSI. (*Id.*) On November 12, 2008, Johnson requested a review of the ALJ's decision. (R. 9.) On July 2, 2009, the Appeals Council concluded that there was no basis under the Social Security Administration regulations for granting the request for review of the ALJ's decision. (R. at 1-3.) Therefore, the ALJ's decision stands as the final decision of the Commissioner of Social Security. *See* 20 C.F.R. § 416.1418. On August 24, 2009, Johnson filed the instant action pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

## Facts

Johnson was thirty-nine years old when the ALJ issued his decision. (R. 83.) He had completed two years of college. (R. 126). He previously worked as an auto rental agent, an auto salesperson and a mortgage broker. (R. 123, 131-38.) Johnson alleges that he began suffering from narcolepsy in 1989 and that seizures related to this condition ultimately required him to stop working in 2000. (R. 29, 122.) Johnson also alleged he suffers from depression in his claim for DIB and SSI, but he has waived this claim by not contesting the ALJ's finding on depression in his appeal. (R. 17.)

2

**Johnson's Testimony**

On September 22, 2008, Johnson testified at the hearing before the ALJ that he started experiencing problems with narcolepsy in 1989 and was discharged from the Army because of these problems. (R. 29.) Later, Johnson began receiving veteran's benefits which were increased to 100% in 2006 when unemployability was added. (R. 29-30.) Johnson pays child support for his oldest daughter. (R. 30.) At the time of the hearing, he had one other child and another one on the way. (*Id.*)

Johnson sees Dr. Margolis for his condition. (R. 31.) At the time of the hearing, Johnson was suffering from three to five seizures per day where his legs would start to twitch, his eyes would roll back and he would fall asleep for twenty minutes to two hours. (R. 31, 35.) Each day, he takes 300 milligrams of modofonal provigil, ten milligrams of amoquozal, and two aspirations per nostril of Nasonex. (R. 29.) The modofonal provigil does not prohibit the seizures, but it helps maintain a normal lifestyle. (R. 32.) From 2000 to 2006, Johnson could not afford prescription medication, and he drank energy drinks and took herbal treatments instead. (R. 29, 36-37.) During this time, Johnson claims he was told he was not eligible for veteran's benefits. (*Id.*) He never applied for medical assistance during this period. (R. 37.) During the two years prior to his testimony, Johnson sought medical care as a result of injury from a seizure. (R. 32.)

Johnson used to work as a salesman at a car dealership, but he had to quit that job because there was too much downtime during which he tended to fall asleep. (R. 28.) However, a co-worker, who was his friend, helped him stay awake. (*Id.*)

Johnson does not trust himself to be left alone with his two-year-old daughter. (R. 32.) He does not go out alone in public because he fears falling asleep in public or getting robbed.

(*Id.*) He has fallen asleep in public before. (*Id.*) Further, he does not work around the house or cook because he fears breaking or burning something and he tires easily from such activities. (R. 33.) Johnson has little or no energy during the day, and any activity can make him tired. (R. 33.) He may get as much as ten hours of sleep per day, but it is typically broken into segments of three or four hours. (R. 33-34.) He goes to bed at 10:00 p.m. and wakes up at 6:00 a.m., but he also takes a two-hour nap everyday at about 2:00 p.m. (*Id.*) Dr. Margolis recommended that he take two naps each day. (R. 34.)

**Testimony of Dr. Laura Rosch, Medical Expert**

Dr. Rosch testified that her review of Johnson's medical records, which include abnormal sleep study results, showed that he has a severe medically determined impairment in the form of narcolepsy. (R. 38.) She also noted the gap in medical evidence until early 2006. (*Id.*) Dr. Rosch testified that since December 7, 2005 Johnson's condition equaled Listing 11.02 because that was the first documentation of continuous treatment, therapy and lack of response to therapy. (R. 39-40.) Further, Dr. Rosch testified that it would not be unreasonable to find that Johnson had a residual functional capacity with no exertional limitations prior to that time. (R. 39.)

**Testimony of Mr. Thomas Guslaw, Vocational Expert**

Mr. Guslaw testified that Johnson's past relevant work as an automobile salesman was light and skilled, his work as a rental clerk was light and semi-skilled and his work as a porter was medium and unskilled. (R. 42-43.) Mr. Guslaw also testified that these jobs are within a

thirty-pound lifting restriction. (R. 43.) Further, Mr Guslaw testified that twenty-minute to two-hour rest breaks would not be consistent with employment. (R. 44.)

**Medical Evidence**

On July 19, 1996, Johnson underwent a sleep study with Dr. Benjamin Margolis at the Snoring and Sleep Disorder Center. (R. 140-44.) Dr. Margolis found that the polysomnography and multiple sleep latency test were strongly suggestive of narcolepsy. (R. 141.) He recommended that Johnson continue medical therapy with appropriate counseling in "sleep hygiene." (*Id.*)

On January 4, 2006, Dr. Margolis reported that he saw Johnson in December 2005, the first time since the sleep study in 1996. (R. 255.) Johnson had been off Cyclert, a medication he was given at the sleep study, for three years. (*Id.*) Dr. Margolis described narcolepsy as a life-long disease and noted that Johnson should take naps every two days. (*Id.*) He also recommended that Johnson should not drive if he was sleepy and prescribed medication for Johnson. (*Id.*)

On May 17, 2006, Dr. Margolis reported that Johnson underwent a sleep study in 1996 and that he continued to have sleep attacks three to five times per day. (R. 139.) Also in May 2006, Johnson began treatment at the Veterans' Administration Medical Center in Hines, Illinois ("Hines VA"). (R. 193-212, 261-329.) During this treatment, Dr. Mamdani performed a neurological consultation. (R. 271-74.) Johnson told Dr. Mamdani that he was working as a home rehabber and that if he got to work at 8:00 a.m. he would feel an urge to sleep around 1:00 or 2:00 p.m. (R. 272.) When he felt this urge, Johnson would take a ten-minute nap, wake up refreshed, and would feel fine until 8:00 or 9:00 p.m. (*Id.*) Johnson further stated that he sought

100% disability because no employer would hire him if he needed naps during the day. (*Id.*) Dr. Mamdani pointed out that employers did not need to know if Johnson took naps during his ten-minute coffee breaks, and Johnson reluctantly agreed. (*Id.*)

Despite the facts described in Dr. Mamdani's report, Johnson stated in a June 2006 work history report that he stopped working regularly in 2000. (R. 131.) He did report attempting other jobs after 2000, but they were quickly terminated because of his medical condition. (R. 109-15).

On June 14, 2006, Dr. Margolis completed an "Epilepsy Report" and reported that Johnson was diagnosed with narcolepsy but that his follow-up appointments were limited by cost. (R. 183.) Dr. Margolis also reported that Johnson had three to five sleep attacks per day and could not do any activity that required prolonged attention, operate machinery or drive long durations. (R. 184.)

On November 14, 2006, Dr. Margolis completed a sleep disorder residual functional capacity assessment for Johnson and concluded that he was having four to five sleep attacks per day. (R. 330-35.) He also found that Johnson would need three to four breaks during a workday at unpredictable times and would be absent more than four times per month due to his condition. (R. 333-34.) On December 29, 2006, Dr. Margolis reported that, despite taking Provigil, Johnson suffered from ten to twelve sleep attacks each week that lasted one hour each. (R. 254.)

On August 28, 2006, Dr. Joseph Nemeth performed a psychological evaluation of Johnson. (R. 215-16.) Dr. Nemeth reported that Johnson appeared fatigued, and Johnson told him he felt fatigued and had to take two or more naps a day, which affected his ability to hold a job. (*Id.*) Dr. Nemeth diagnosed Johnson with dysthymic disorder and narcolepsy. (*Id.*)

6

On April 10, 2008, Dr. Margolis wrote that Johnson was still suffering from sleep attacks despite taking Provigil. (R. 356.) Further, he noted that Johnson was not covered under any health plan and could not seek regular outpatient care. (*Id.*)

**Evidence from Third Parties**

Several family members and friends of Johnson reported that they had witnessed him falling asleep and having sleep seizures sporadically and unpredictably over many years. (R. 155-56, 163, 245, 249-50.) Johnson's mother wrote that this continued despite the medication he took. (R. 245.) Further, on January 9, 2007, T'Vo Robinson confirmed that he had worked with Johnson and had tried to keep him awake and alert so he would not get fired or hurt. (R. 249.) Robinson associated Johnson's sleeping illness with his inability to stay employed. (*Id.*)

## Discussion

Judicial review of the Commissioner's decision is authorized by section 405(g) of the Act. 42 U.S.C. § 405(g). The court may affirm, modify or reverse the ALJ's decision, and it may remand for rehearing of the case or hearing of additional evidence. *See* 42 U.S.C. § 405(g). In reviewing this decision, the court should not analyze the facts to make its own determination of plaintiff's disability. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (internal citations omitted). Instead, the court should review the entire record to determine whether the ALJ applied the correct legal standards in reaching a decision and "whether there is substantial evidence in the record to support the findings." 42 U.S.C. §§ 405(g), 1383(c)(3); *Washington v. Barnhart*, 481 F. Supp. 2d 905, 912 (N.D. Ill. 2007).

7

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court must carefully review the ALJ's decision to ensure that she has "rationally articulate[d] the grounds for her decision" and built an "accurate and logical bridge from the evidence to her conclusion." *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002). The ALJ's rationale must be detailed and descriptive so that a reviewing court can meaningfully review the ALJ's reasoning. *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 93 (3d Cir. 2007). As such, a "mere scintilla" of evidence is not enough. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Where the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d. at 941.

A court should grant disability benefits to a claimant who can establish he is under a "disability" as defined in the Social Security Act. *Liskowitz v. Astrue*, 559 F.3d 736, 739-40 (7th Cir. 2009). "Disability" is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process in determining disability. 20 C.F.R. §§ 404.1572(b), 416.920(b). The Commissioner must decide each of the following steps in order: (1) whether the claimant is currently engaging in substantial gainful activity; (2) whether he has a severe medical impairment that meets the duration requirement as defined in 20 C.F.R. § 416.909; (3) whether his impairment(s) meets or equals any impairments listed by the Commissioner as conclusively disabling and meets the duration requirement; (4) whether the claimant can perform his past work; and if not (5) whether the claimant is capable of adjusting to

8

other work based on his age, education and work experience. 20 C.F.R. §§ 404.1572(b), 416.920(b), 423(d)(2)(A). Substantial gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Although the claimant generally bears the burden of proving he is disabled, some burden shifts to the Social Security Administration at step five to show that other work exists in a significant amount that the claimant can do. 20 C.F.R. §§ 404.1560(c), 416.960(c).

Proceeding under the foregoing framework, the ALJ concluded that Johnson was not disabled under sections 216(i) and 223(d) of the Social Security Act and thus not eligible for DIB. However, an ALJ must explain his reasoning with enough detail and clarity to permit meaningful appellate review. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Here, the ALJ concluded that Johnson was not disabled according to sections 216(i) and 223(d) through March 31, 2002. (R. 9.) At step one, he found that Johnson has not engaged in substantial gainful activity since June 1, 2000. (R. 17.) At step two, he found that, for a sufficient duration, Johnson had suffered from narcolepsy, which is a severe impairment under the Act. (*Id.*) Next, at step three, the ALJ found that, prior to December 7, 2005, claimant did not have an impairment or combination thereof that met or equaled those listed in 20 C.F.R. § 404, Subpart P, Appendix 1. (*Id.*) However, the ALJ failed to articulate sufficiently the grounds for his decision regarding the narcolepsy impairment and failed to build an accurate and logical bridge between the evidence and his conclusion.

First, in determining that Johnson did not meet the requirements for DIB, the ALJ simply states, "claimant's statements concerning the intensity, duration and limiting effects of these

9

symptoms are not entirely credible prior to December 7, 2005." (R. 19.)[1] In *Zurawski v. Halter*, the court remanded the proceedings because the ALJ solely stated that claimant's testimony was "not entirely credible due to the inconsistencies with the objective medical evidence, and inconsistencies with daily activities." 245 F.3d 881, 887 (7th Cir. 2001). In the instant case, the ALJ's rationale is even less descriptive. To support his conclusion, the ALJ merely cited the medical expert's opinion and the lack of medical records supporting Johnson's claim. (R. 18-19.) However, this court has found previously that simply restating evidence is insufficient. *See Keys v. Barnhart*, 430 F. Supp. 2d 759, 773 (N.D. Ill. 2006). Further, the ALJ never states that this is the reason why he found claimant's testimony unreliable.

Similarly, the ALJ does not provide "specific reasons" for his finding that Johnson's statements are not credible even though the ALJ is required to do so. *See* SSR 96-7p, 1996 WL 374186, at *2; *see also Steele*, 290 F.3d at 941-42. In *Steele*, the court remanded the proceeding where the ALJ merely stated that "[t]he claimant's subjective complaints and alleged limitations were considered under the criteria of Social Security Ruling 96-7p and found credible only to the extent of precluding the claimant from performing work in excess of light level." *Steele*, 290

---

[1] Social Security Ruling 96-7p applies to the ALJ's evaluation of an applicant's description of symptoms and provides:

> It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered' or that 'the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for the weight.

SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

10

F.3d at 942. This conclusory statement is similar to the ALJ's finding in the instant case that "claimant's statements . . . are not entirely credible." (R. 19.) Further, the ALJ's statement in this case is precisely the kind that Social Security Ruling 96-7p seeks to avoid by requiring specific reasons to support the conclusion.

The ALJ also states that the medical expert's opinions are the most informed and consistent with the record as a whole. (R. 20.) Thus, he, in essence, gave her opinions substantial weight. (*Id.*) If supported with a logical bridge from the evidence to the conclusion, this would likely be sufficient for the ALJ's conclusion. However, the ALJ does not state with specificity what aspects of the expert's testimony are consistent with the record. Thus, the statement is just as conclusory as the statement about claimant's credibility. Further, the ALJ's finding would be more specific if directly related to claimant's credibility rather than forcing the reviewing court to infer that claimant's testimony is less informed and less consistent with the record.

The ALJ might have based his credibility determination on the fact that Johnson told Dr. Mamdani he was working as a home rehabber as late as May 2006 and that if he took a ten-minute nap at 1:00 or 2:00 p.m., he would feel fine until 8:00 or 9:00 p.m. (R. 272.) The ALJ might also have based his credibility conclusion on Dr. Rosch's belief that finding Johnson had a residual functioning capacity prior to December 7, 2005 would not be unreasonable even though he claimed he could not work. (R. 39.) He may have also based his determination on Johnson's failure to pursue medical assistance despite his alleged condition at the time. (R. 37). However, the ALJ does not explain his reasoning or provide a logical connection between his conclusion and the evidence in the record, and so the case must be remanded for further consideration of this Court's ruling.

11

The ALJ also does not specifically address SSR 83-20, and he fails to acknowledge or address all of the evidence regarding the determination of the onset date. *See generally* SSR 83-20, 1983 WL 31249 (1983). The ALJ again bases his conclusion on the medical expert's testimony and the lack of treatment between 2000 and 2005. (R. 18-19.) However, SSR 83-20 requires three factors to be considered in determining the onset date: (1) the applicant's allegations, (2) work history, and (3) medical and other evidence. *Lichter v. Bowen*, 814 F.2d 430, 434 (7th Cir. 1987) (citing SSR 83-20, 1983 WL 31249, at *2). While the ALJ considered some evidence, including the work history, the medical expert's testimony, the vocational expert's testimony and medical treatment, he does not fully examine Johnson's testimony or the reports of his friends and family that suggest he may have been disabled before December 7, 2005. Additionally, while SSR 83-20 provides that "[t]he impact of lay evidence on the decision of onset will be limited to the degree it is not contrary to the medical evidence of record," this evidence does not contradict the record. SSR 83-20, 1983 WL 31249, at *3. It merely offers evidence where the record is silent. (R. 18.)

Further, the ALJ mentioned that Johnson could not afford medication, but he did not weigh the prohibitive cost as a possible reason why Johnson was not taking medication. (R. 183, 87). The ALJ failed to explain why he discredited Johnson's reasons for the lack of medical evidence. The ALJ also did not provide a reason why he discredited Johnson's testimony about his inability to afford treatment. *See, e.g., Woolridge v. Barnhart*, No. 03 C 0105, 2004 WL 2066918, at *6-7 (N.D. Ill. Sept. 8, 2004) (remanding case because the ALJ discredited claimant's testimony that he could not afford medical treatment based on an overbroad assumption that free medical aid is "generally available to the indigent in this county.").

Finally, the ALJ failed to consider non-contemporaneous evidence that could establish an onset date. SSR 83-20 indicates that in some cases it may be possible based on medical records to infer that the onset of disability occurred sometime prior to the date of the first recorded examination. SSR 83-20, 1983 WL 31249, at *3. Here, general statements about narcolepsy being a "lifelong disease" are not likely adequate because they do not have a legitimate medical basis, but they should be considered and weighed, even if slightly. (*Id.*)

The ALJ also did not explicitly consider the evidence suggesting there might have been additional limitations prior to December 7, 2005, as he was required to do pursuant to SSR 96-8p. (R. 19.) The ALJ found that the Disability Determination Services assessment was made without considering evidence submitted subsequently for review. (*Id.*) As to this assessment, the ALJ explained his reasoning for the weight he allocated and made a logical bridge from the evidence to his conclusion. Further, the ALJ considered the opinion of the medical expert, Dr. Rosch, who agreed that Johnson had no exertional limitations. (R. 39.) The ALJ also relied on the vocational expert's testimony to conclude that Johnson was able to perform light and skilled labor as an auto rental clerk prior to December 7, 2005. (R. 19.) However, despite these considerations, the ALJ still does not assess the credibility of the claimant in his complaints of disability prior to December 7, 2005. (R. 17-20.)

The Social Security Regulations mandate that no symptom "can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce symptoms." SSR 96-7p, 1996 WL 374186, at *1. While there were no formal medical findings during the period in question from 2000 to 2005, the ALJ should have considered non-

concurrent medical evidence that suggests Johnson may have suffered from a disability during this time. SSR 83-20, 1983 WL 31249, at *3. The prior sleep study showed that he had a severe impairment. (R. 38.) Further, Dr. Margolis subsequently treated Johnson for severe narcolepsy. (R. 29-35). His treatment provided support for concluding that Johnson was disabled after December 7, 2005. (R. 19.) This medical evidence establishes a reasonable basis for evaluating other evidence such as testimonies of Johnson and others close to him. While the medical evidence is the primary element in determining the onset date, that "does not mean that a claim is doomed for lack of medical evidence establishing the precise date an impairment became disabling." *Briscoe ex rel. Taylor*, 425 F.3d at 353. Thus, the ALJ did not adequately support his determination regarding Johnson's residual functional capacity assessment.

The ALJ's determination as to the last step of the Social Security Administration's framework is not contested by the parties in this case. However, this Court cannot determine whether the ALJ's conclusion was supported by substantial evidence because the ALJ failed to adequately connect the evidence to the substance of his conclusions or give specific reasons for his credibility determinations. This does not mean his conclusions were improper because they could have been supported by the evidence that Johnson worked as a rehabber in 2006, there is a gap in medical records before 2006 and the medical expert testified that the ALJ's conclusion would not be unreasonable. However, the ALJ failed to build a logical bridge from the evidence to his conclusion. Thus, the case must be remanded for this determination as well.

Upon remand, the ALJ should describe in detail the weight that he gave the evidence. He should also explain why he disregarded some evidence, including but not limited to the reports by friends and family that Johnson had suffered from severe narcolepsy before December 7, 2005. His discussion of the evidence should contain a thorough examination of what evidence

was credible and how it was weighed in light of other evidence. The ALJ should also give specific reasons why he found some evidence more consistent with the record than other evidence.

## Conclusion

For the foregoing reasons, the Court grants in part and denies in part plaintiff's motion for summary judgment [doc. no. 18]. The Court denies the motion to the extent that it seeks a reversal of the ALJ's decision and grants the motion to the extent that it requests that the case be remanded for further proceedings, which shall be consistent with this opinion. This case is hereby terminated.

SO ORDERED.  ENTERED: JUL 09 2010  7-9-2010

RONALD A. GUZMAN
United States District Judge